UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JEROME SWARTZ and STARNETTE WATKINS (formerly STARNETTE SWARTZ),

                     Plaintiffs,

      – against –

UNITED STATES OF AMERICA,

                     Defendant.

**MEMORANDUM & ORDER**

17-cv-5914 (ERK) (AKT)

KORMAN, *J.*:

    This case arises from a failed investment in the film industry.  Plaintiff Jerome Swartz, a retired engineer and wealthy investor, invested a total of $4.5 million in two LLCs that financed films.[1]  He claims that his investment proved worthless and that he abandoned his interests in the LLCs.  Swartz sought to carry back these losses and thereby claim a refund on his previously-filed tax returns.  The IRS denied the deduction, and plaintiff filed suit seeking a refund.  The United States moves for summary judgment.

---

[1]     Plaintiff Starnette Watkins was added as a necessary party because she and Swartz were married and filed taxes jointly during the 2008 tax year.  *See* Order dated July 11, 2019.  Because Swartz performed all the actions relevant to this case, for simplicity's sake I refer only to him.

## BACKGROUND

Swartz was an accomplished engineer who focused on aircraft and computer technology.  ECF No. 54 ¶ 10; ECF No. 57 ¶ 1; ECF No. 51-7.  He retired in 2004 and then focused on investing, particularly in entertainment.  ECF No. 57 ¶¶ 2–3.  In August 2007, Swartz invested $1.5 million in securities of CT1 Holdings, LLC, a "global entertainment company" that owns, finances and distributes films.  ECF No. 54 ¶ 2.  In the purchase agreement, Swartz stated that his net worth was above $50 million and that he had $800,000 in gross income in 2005, $1 million in gross income in 2006, and expected more than $2 million in gross income in 2007.  ECF No. 51-2 at 3.[2]  Swartz also acknowledged in the purchase agreement that his investment was "highly speculative" and that he had been advised that he "should consider an investment in the interests only if [he] is able to afford a loss of [his] entire investment." *Id.* at 12.

Two months later, Swartz invested another $1 million in Alliance Film Finance, LLC, which also finances and distributes films.  ECF No. 54 ¶ 3.  That purchase agreement similarly warned him that his investment was "speculative, involves a high degree of risk and should be considered only by accredited investors who can bear the economic risks of their investments for an indefinite period and

---

[2]      All citations to the record are to the page number in the ECF header, not the internal pagination of the document.

2

who can afford to sustain total losses of their investments." ECF No. 51-3 at 5. And, like the agreement with CT1, it required him to warrant that he was "acquiring the [i]interests for investment purposes." ECF No. 54 ¶ 11. In this purchase agreement, Swartz stated that his net worth was above $70 million, that he had earned $782,000 gross income in 2005, $4.1 million gross income in 2006, and expected to earn $4 million in gross income in 2007. ECF No. 51-3 at 15. Swartz made an additional $2 million investment in CT1 on March 20, 2008, which was earmarked for the film "Love Ranch." ECF No. 54 ¶ 4.[3] Swartz admitted that he had no consulting role related to this movie "other than having watched" it. ECF No. 54 ¶ 27.

Swartz's investments did not give him any control over the LLCs, both of which were controlled by a man named David Bergstein. ECF No. 54 ¶¶ 5, 19, 23–24. Swartz did, however, have a consulting contract with CT1, pursuant to which its parent company would pay him $60,000 per year. *Id.* ¶ 20. The consulting agreement provided that Swartz would chair the company's Board of Advisors, which Swartz later described as a "nonmeaningful term"; indeed, he never held a meeting during his tenure and was unaware of any other board members. *Id.* ¶ 21;

---

[3]     The "Love Ranch" investment letter stated that half of the $2 million investment would be an equity investment in the film. The remaining $1 million would be either equity or a loan, at Swartz's discretion. ECF No. 51-5 at 1. James King, who was Swartz's accountant and held his power of attorney, testified that this entire investment was designated as "all equity." ECF No. 53-1 at 14.

*see also* ECF No. 51-12 at 1.  The consulting agreement permitted Swartz to work however many hours he chose and required him only to be "available" to work "at a minimum of one (1) day per month."  ECF No. 51-12 at 1.  This agreement was effective January 1, 2008, but Swartz only signed it on March 20, 2008 (the day he made his final investment in CT1).  *Id.* at 1, 6.  Swartz did not have any advisory or consulting role with Alliance Film.  ECF No. 54 ¶ 26.

Swartz suffered a brain hemorrhage in July 2008.  ECF No. 57 ¶ 4.  He took a break from consulting until February 2009 and assigned a power of attorney to his accountant, James King.  *Id.*; ECF No. 54 ¶ 22.  Neither Swartz nor King ever received financial reports from CT1 or Alliance Film.  ECF No. 54 ¶¶ 25, 36; ECF No. 57 ¶ 19.

In March 2010, a group of investors filed an involuntary bankruptcy petition against CT1's parent company, R2D2 LLC, which Bergstein contested.  ECF No. 54 ¶¶ 30, 32.  In February 2011, the bankruptcy court determined that CT1 should be in bankruptcy.  *Id.* ¶ 33.  The bankruptcy trustee issued a report in April 2011, which Swartz says formed the basis of his conclusion that his investment in CT1 was worthless.  *Id.* ¶ 34.

Alliance Film was not part of the involuntary bankruptcy.  ECF No. 54 ¶ 35.  In March 2012, however, Bergstein sent King a letter that Alliance Film "wound up its operation approximately one year ago" and "has no further value."  *Id.* ¶ 37.

4

Bergstein explained that Alliance Film had loaned all its money to films owned by R2D2's subsidiaries, which were all in bankruptcy. *Id.* Bergstein's letter stated that there was therefore "no chance of recovery." *Id.*

Swartz claims that he abandoned his interests in both CT1 and Alliance Film through a call that King made to Bergstein in December 2010. ECF No. 54 ¶¶ 38–39. Swartz and King never conveyed that intent to abandon the investments to anyone else. *Id.* ¶ 39. Nor did they send written notice, even though the LLC agreements required that all communications be made in writing. *Id.* ¶¶ 9, 47. Swartz never personally communicated his intent to abandon the investments, but says that he stopped communicating with Bergstein around 2012 or 2013. ECF No. 51-6 at 3–4, 7, 11.

Despite Swartz's claim that he abandoned his interests in the LLCs, he testified in 2013 that he did not file a claim in the bankruptcy proceeding because he remained "faithful to the relationship" with Bergstein and continued to believe "that [Bergstein] would work his way out of these things, and come through and take care of me, since it was a close, personal relationship." ECF No. 51-8 at 2. Swartz testified that he believed Bergstein would take care of him "even up to relatively recently, like a year or two ago"—*i.e.*, until 2011 or 2012. *Id.* That hope proved futile, and Swartz never recovered "a penny" of his $4.5 million investment. ECF No. 54 ¶ 6.

In 2014, Swartz filed a late tax return for 2010 to claim a net operating loss based on these failed investments.  ECF No. 54 ¶¶ 53–54.  He sought to carry back this loss to 2008 and 2009, which would have permitted him to obtain a refund for those years.  *Id.*  The IRS denied a refund.  *Id.* ¶ 56.  I have jurisdiction under 28 U.S.C. § 1346(a)(1).

## STANDARD OF REVIEW

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant meets its initial burden, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).  "In determining whether there is a genuine dispute as to a material fact, [I] resolve all ambiguities and draw all inferences in favor of the non-moving party."  *Vincent v. The Money Store*, 736 F.3d 88, 96 (2d Cir. 2013) (internal citation omitted).

## **DISCUSSION**

A taxpayer may deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  26 U.S.C. § 165(a).  To deduct the loss, it "must be evidenced by closed and completed transactions, fixed by identifiable events, and . . . actually sustained during the taxable year."  26 C.F.R. § 1.165-1(b).[4]  The taxpayer bears the burden of showing that he is entitled to a deduction.  *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992).

I assume, without deciding, that Swartz suffered the loss in 2010.  Even if the loss occurred in that year, Swartz is not entitled to carry it back to 2008 and 2009, which is the only relief he seeks because those were years in which he had "substantial income" and could have obtained a "full tax refund."  ECF No. 53-1 at 21.  He is not entitled to carry back the 2010 losses to his 2008 and 2009 income tax returns because those losses were capital (rather than ordinary) losses.  Even if Swartz's failed investments were ordinary losses, they were not incurred in his trade or business and thus could not be carried back to 2008 and 2009.

## I. **Swartz May Not Carry Back His Loss Because His Investments Were Capital Assets**

The tax code differentiates between two kinds of losses: an ordinary loss and a capital loss.  *United States v. Generes*, 405 U.S. 93, 95–96, 100–01 (1972); *see*

---

[4]   All citations to the statutes and regulations are to the versions in effect in 2008 through 2010.

*also Marrin v. Comm'r*, 147 F.3d 147, 150 (2d Cir. 1998).  An individual taxpayer may carry back his excess ordinary losses incurred in his trade or business (known as a "net operating loss") and deduct them from prior years' income.  *Generes*, 405 U.S. at 102–03; *see* 26 U.S.C. §§ 172(b)(1)(A), 172(c).  By contrast, an individual may not carry back losses from capital assets because they are not included in the calculation of the net operating loss.  *See* 26 U.S.C. §§ 165(f), 172(d)(2)(A), 1212(b); *see also Palahnuk v. Comm'r*, 544 F.3d 471, 472–73 (2d Cir. 2008) ("except for a $3000 annual deduction, non-corporate taxpayers may not include net capital losses in the calculation of" a net operating loss under § 172).

The Supreme Court has held that a taxpayer's equity investment is treated as a capital asset even if he acquired it as part of his trade or business (with exceptions not relevant here).  *Ark. Best Corp. v. Comm'r*, 485 U.S. 212, 222–23 (1988).  Swartz's investment in the LLCs was, as King testified, "all equity," and therefore was a capital asset.  ECF No. 53-1 at 14.  As King explained, if "the companies had been profitable, then he would have been entitled to his, you know, share of those profits."  ECF No. 53-1 at 12.  Both purchase agreements warranted that the buyer was acquiring the interests for "investment purposes" and warned that the investment was "highly speculative" and could be lost in its entirety.  ECF No. 54 ¶¶ 11, 13–16.  Those are among the hallmarks of an agreement to provide capital in exchange for equity in the companies.  *See Ark. Best Corp.*, 485 U.S. at 222–23.

8

Swartz would therefore not be able to carry back his losses in his equity investments because they were capital assets. *Palahnuk*, 544 F.3d at 472–73; *Merlo v. Comm'r*, 492 F.3d 618, 623 (5th Cir. 2007); *Furer v. Comm'r*, 33 F.3d 58, 1994 WL 417425, at *3 (9th Cir. Aug. 10, 1994) (table); *Pierce v. United States*, 76 Fed. Cl. 638, 644 (2007); *Kirch v. Comm'r*, 94 T.C.M. (CCH) 291, 2007 WL 2687618, at *2 (Sept. 13, 2007); *Zilber v. United States*, 585 F.2d 301, 306–07 (7th Cir. 1978).

I reject Swartz's argument that he should be considered a member of a partnership, which would in some circumstances allow him to treat his investment as a non-capital asset. *See Pilgrim's Pride Corp. v. Comm'r*, 779 F.3d 311, 314 (5th Cir. 2015); *see also* Rev. Rul. 93-80, 1993-2 C.B. 239. A court examining whether an entity is entitled to partnership tax status must examine "all the facts," including the entity's governing documents and the parties' conduct, statements, and relationships, as well as their "respective abilities and capital contributions," their "actual control of income and the purposes for which it is used," along with "any other facts throwing light on their true intent." *TIFD III-E, Inc. v. United States*, 459 F.3d 220, 231–32 (2d Cir. 2006). "This test turns on the fair, objective characterization of the interest in question upon consideration of all the circumstances." *Id.* at 232.

The practicalities of Swartz's relationship with the LLCs belie his assertion that he was a member of a partnership. The Second Circuit has held that a passive

investor with no meaningful control over the enterprise is not entitled to partnership tax status. *Estate of Kahn v. Comm'r*, 499 F.2d 1186, 1189–90 (2d Cir. 1974).   In *Kahn*, the Court of Appeals explained that partnership status does not flow simply from the fact that the entity's documents describe it as a partnership or that the alleged partner was entitled to a share of the profits. *Id.* at 1189.   Rather, it rejected the taxpayer's theory that the entity was a partnership, because one of the "partners" in that case had the sole discretion to control and dispose of the entity's assets. *Id.* In light of the taxpayer's "dominant position" in the company, along with the undisputed fact that he had "sufficient legal and practical control to misappropriate" some of the company's assets, the Court of Appeals held that the company was not a bona fide partnership even though the company's owners had a profit-sharing agreement. *Id.* at 1189–90.

Similarly here, the undisputed evidence demonstrates that Swartz was a passive investor who lacked any control over the LLCs' assets or business.   Swartz admitted in the purchase agreements that he was acquiring the membership interests for "speculative" "investment purposes," and did not indicate that he was joining a partnership. ECF No. 54 ¶¶ 11, 14; *see* ECF Nos. 51-2, 51-3, 51-5.   He "was not the manager of either entity" and lacked "any control over how" CT1 or Alliance Film "spent the money that he had invested."  ECF No. 54 ¶¶ 19, 23, 26; *see also* ECF No. 51-6 at 15.   Indeed, Swartz testified that he never received any financial reports

from the LLCs and was ignorant of their financial problems until a bankruptcy petition was filed against CT1 in March 2010.  ECF No. 54 ¶¶ 29–30, 36; *see also* ECF No. 57 ¶ 11.  Nor is there any evidence that the LLCs filed tax returns as partnerships or represented themselves as partnerships to anyone else.  *See TIFD III-E, Inc.*, 459 F.3d at 232 (citing *Luna v. Comm'r*, 42 T.C. 1067, 1077–78 (1964) (explaining that one factor courts may consider is "whether the parties filed Federal partnership returns or otherwise represented" that they were partnerships)).  In sum, the evidence amply demonstrates that Swartz played no role in managing the LLCs and had no control over their assets.  He was instead a passive investor who relied on others to pursue profit but was not a partner of the LLCs.  *See Kahn*, 499 F.2d at 1189.

## II.    Swartz's Investment Was Not in His "Trade or Business"

Even if Swartz were permitted to treat his failed investments as ordinary losses, they were not in his trade or business.  "The distinction is important because in calculating a net operating loss to be carried back to previous years, a taxpayer may take in full all of the deduction attributable to trade or business loss, whereas deductions not attributable to trade or business losses are only allowable to the extent the gross income is not derived from a trade or business.  *See* 26 U.S.C. § 172(c) and (d)(4)."  *Chernin v. United States*, 149 F.3d 805, 811 (8th Cir. 1998); *see also Lender Mgmt., LLC v. Comm'r*, 114 T.C.M. (CCH) 638, 2017 WL 6403890, at *8 (Dec. 13,

2017) ("net operating losses may carry over under section 172 from the year in which they were incurred to another year only if the losses were the result of operating a trade or business").

An individual is engaged in a trade or business only if he is "involved in the activity with continuity and regularity." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987). The record is clear that Swartz was not in the trade or business of making or producing films. He spent his career as an engineer with a focus on designing aircraft and computer software. ECF No. 51-7. Nevertheless, Swartz claims that, after he retired, he entered into "the business of investing in entertainment properties." ECF No. 53 at 19. The Supreme Court has held, however, that being an investor to pursue personal profit is not a trade or business for tax purposes. *Whipple v. Comm'r*, 373 U.S. 193, 202 (1963); *see also Chamberlin v. Comm'r*, 14 F. App'x 69, 71–72 (2d Cir. 2001); *Burnet v. Clark*, 287 U.S. 410, 413–15 (1932).

Swartz nonetheless claims that his consulting agreement with CT1, along with his agreement to serve as chair of its Board of Advisers, demonstrates that he was in the trade or business of producing films, particularly given the $60,000 salary he was to be paid for the approximately three to five hours per week that he worked. ECF No. 53 at 19–20. And yet the record reflects that Swartz's role as chairman was, as he testified, "nonmeaningful" and involved no work, and that he spent little time doing any work as a consultant. ECF No. 54 ¶ 21. Indeed, Swartz admits that

on his tax returns he characterized a different loan he made to CT1 as "nonbusiness" debt, which is the antithesis of an investment made in a taxpayer's trade or business. ECF No. 54 ¶ 57; *see Generes*, 405 U.S. at 95–96 (contrasting nonbusiness debt with debt incurred in a trade or business).

In any event, Swartz's losses were not "the *result* of operating a trade or business" with CT1 or Alliance Film. *Lender Mgmt., LLC*, 2017 WL 6403890, at *8 (emphasis added). He made his initial $1.5 million investment in CT1 seven months before he had any consulting relationship with the company, and invested the additional $2 million in CT1 on the same day he entered into the consulting agreement and became the chair of the Board of Advisers (which apparently had no other members and held no meetings). *See Garner v. Comm'r*, 987 F.2d 267, 272–73 (5th Cir. 1993) (explaining that the taxpayer's motive must be assessed at the time of his investment). Even with respect to his consulting role, the Supreme Court has explained that "furnishing management and other services to corporations for a reward not different from that flowing to an investor in those corporations is not a trade or business." *Whipple*, 373 U.S. at 202. As the United States observes, there is no evidence that Swartz was ever actually paid (or sought to collect) the $60,000 he was owed under the consulting contract, and thus any returns that he hoped to receive from CT1 were no different "from that flowing to an investor[.]" *Id.*; *see* ECF No. 56 at 16–17. And Swartz never had any business or consulting relationship

13

with Alliance Film other than his investment.  The undisputed facts therefore make plain that Swartz was a mere investor for personal profit and was not investing pursuant to his trade or business.

The Supreme Court has explained, in a related context, why Swartz's claim fails.  In *Generes*, the Court set forth the test for how to characterize a taxpayer's losses when he was both an employee and shareholder of the company to which he made loans.  The key issue in that context was whether he made the loan to protect his ability to earn an income as an employee (in which case his loss would be an ordinary loss incurred in his trade or business) or if instead the loan was intended to support his equity interest (and thus should be treated as a capital loss).  405 U.S. at 95–96, 104.  The Supreme Court observed that whether the debt was incurred for business or nonbusiness reasons was directly relevant to whether the loss could be carried back as a net operating loss under § 172.  *Id.* at 96.

The *Generes* court held that, in order to claim that the loss was made in his trade or business, the taxpayer must show that his "dominant" motive for making the loan was to protect his salary rather than to protect his equity investment in the company.  405 U.S. at 103.  The Court explained that the "dominant-motivation test strengthens and is consistent with" the tax code's distinction between personal and business losses.  *Id.* at 104–05.  It held that, when determining the taxpayer's motive, courts should compare the size of the taxpayer's salary with his equity investment

14

and access to other funds. *Id.* at 106–07. The Supreme Court concluded that the taxpayer's investment in his own company was a nonbusiness loss because his after-tax annual salary was less than 20% of his total investment. *Id.* at 106–07. There was therefore no reason to believe his "self-serving" statement that his primary motive for making the investment was to "protect [his] job" rather than earn a profit. *Id.* at 106. Indeed, the Supreme Court granted judgment to the United States notwithstanding the jury's verdict for the taxpayer. *Id.* at 106–07.

Swartz's pre-tax consulting salary was less than 2% of his total $3.5 million investment in CT1, far below the 20% of post-tax salary that the Supreme Court found to be too low in *Generes*. 405 U.S. at 106. He also had, by his estimate, a net worth in excess of $70 million and an annual income of several million dollars. As in *Generes*, it would defy belief to conclude that Swartz invested any of this money to protect his $60,000 salary rather than to engage in speculative investing.

In sum, Swartz is not entitled to carry back his losses because his investments were capital assets. Even if the investments were non-capital assets, they were not incurred in his trade or business. Thus, even if Swartz suffered the $4.5 million loss in 2010, he is unable to carry back that loss and claim refunds for 2008 and 2009. Because carrying back the loss is the only relief that he seeks, the United States is entitled to summary judgment.

## <u>CONCLUSION</u>

The motion for summary judgment is granted.  The clerk shall enter judgment

for defendant and close the case.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                    Edward R. Korman
July 20, 2021                         United States District Judge